| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | <u>**FOR PUBLICATION**</u> |

-------------------------------------------------------------x

In re:                                                                    Chapter 7

TEBA A. GUMBS,                                          Case No. 17-23947 (SHL)

                                  Debtor.

-------------------------------------------------------------x

HONEY DO MEN GUTTERS, INC.,

                                  Plaintiff

                    v.                                             Adv. Pro. No. 18-08237 (SHL)

TEBA A. GUMBS,

                                  Defendant.

-------------------------------------------------------------x

<u>**POST-TRIAL MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**CARLOS J. CUEVAS, ESQ.**
*Counsel for Plaintiff Honey Do Men Gutters, Inc.*
1250 Central Park Avenue
Yonkers, NY 10704

**GLEN A. KURTIS, P.C.**
*Counsel for Defendant Teba A. Gumbs*
175 Main Street, Ste. #614
White Plains, NY 10601
By: Glen A. Kurtis, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

        Before the Court are the merits of the above-captioned adversary proceeding.  Plaintiff

Honey Do Men Gutters, Inc. ("HDM") seeks to have the debt owed by Teba A. Gumbs ("Mr.

Gumbs") to HDM found to be non-dischargeable under Section 523(a)(2)(A) of the Bankruptcy

Code.  Stated generally, HDM alleges that Mr. Gumbs induced HDM to provide home

renovations services to him by "false pretenses, a false representation, or actual fraud." *See generally* Complaint [ECF No. 1].[1]  Mr. Gumbs denies HDM's allegations.  *See generally* Answer to Complaint to Determine Dischargeability of Debt Under 11 U.S.C. §523(a)(2)(A) [ECF No. 4].

Trial in this matter took place on June 27 and 28, 2023.  *See* Hr'g. Tr. (June 27, 2023) [ECF No. 132];  Hr'g Tr. (June 28, 2023) [ECF No. 133].  As part of the trial proceedings, the Court received written direct testimony from Darrell Babboni ("Mr. Babboni"), the Chief Executive Officer of HDM.  *See generally* Declaration of Darrell Babboni in Lieu of Direct Testimony ("Babboni Decl.").[2]  The Court also received live testimony from Kerri Haracz, a former employee of HDM, Mr. Gumbs, and additional live testimony from Mr. Babboni.  *See generally* Hr'g Tr. 19:7-36:19, 39:15-150:6 (June 27, 2023); Hr'g Tr. 5:16-107:12 (June 28, 2023).  In addition, the parties submitted documentary exhibits.  *See, e.g.,* Hr'g Tr. 123:21-134:18 (June 28, 2023) (discussing exhibits admitted into evidence).  After trial, the parties submitted proposed findings of fact and conclusions of law.  *See* Proposed Post-Trial Findings of Fact and Conclusions of Law of Honey Do Men Gutters, Inc. [ECF No. 135] ("Plaintiff's Brief"); Defendant's Proposed Findings of Fact and Conclusions of Law [ECF No. 134] ("Defendant's Brief").  Given the evidentiary record at trial and for the reasons set forth below, the Court concludes that the debt owed by Mr. Gumbs to HDM is dischargeable.  This decision constitutes the Court's findings of fact and conclusions of law based on all of the evidence.

---

[1]    References to the Case Management/Electronic Case Filing ("ECF") docket are to Adv. Pro. No. 18-08237 unless otherwise specified.

[2]    The Babboni Declaration was presented to the Court at trial in lieu of live testimony.  However, the Babboni Declaration was not filed on the docket at that time.  To ensure a transparent and clear record, the Court has docketed the Babboni Declaration in anticipation of this Post-Trial Memorandum of Decision.  *See* ECF No. 137.

# FINDINGS OF FACT

## A. HDM and Mr. Gumbs' Relationship

Founded in 2001, HDM is a home repair business that provides home remodeling services including roofing, kitchen and bathroom remodeling, and gutter maintenance. Babboni Decl. ¶¶ 2-4. HDM is licensed as a home improvement contractor in Westchester County, New York. *Id.* ¶ 5. More than a decade ago, Mr. Gumbs purchased a home in Peekskill, New York jointly with his wife. Hr'g Tr. 5:20-6:4 (June 28, 2023). In 2015, HDM and Mr. Gumbs' relationship began when Mr. Gumbs hired HDM to replace the gutters on Mr. Gumbs' residence. Babboni Decl.¶¶ 6-7; Plaintiff Ex. 3. HDM completed the gutter replacement, and Mr. Gumbs paid for that project in full. Babboni Decl. ¶ 8; *see also* Hr'g Tr. 6:12-6:25 (June 28, 2023).

Subsequently, Mr. Gumbs approached HDM about performing another, more extensive project. Hr'g Tr. 8:5-23 (June 28, 2023); *see also* Babboni Decl. ¶ 17. After a sewer pipe broke in the ceiling between the first and second floors of Mr. Gumbs' home, the area was gutted to remediate the damage from the burst pipe as well as mold and other issues found by the insurance company; it had since remained unfinished. Hr'g Tr. 8:10-16 (June 28, 2023). Mr. Gumbs asked HDM if they would be able to renovate the area. *Id.* at 8:17-21. Mr. Gumbs was concerned about financing the project, as he had been unable to obtain financing from a traditional bank. *Id.* at 8:24-9:2. Mr. Babboni referred Mr. Gumbs to Enerbank USA ("Enerbank") to seek financing. *Id.* at 9:2-5, 9:17-18. Enerbank is a bank that specializes in making home improvement loans to homeowners. Babboni Decl. ¶ 10; Defendant Ex. 16 at 6:10-13 (the "Farr Deposition").[3] HDM has worked extensively with Enerbank; Enerbank has

---

[3]       Both parties offered portions of the Farr Deposition into evidence. *See* Plaintiff Ex. 24; *see also* Hr'g Tr. 110:16-122:3 (June 28, 2023). Trenna Farr is collections manager and vice president of Enerbank. Farr Deposition 5:16-6:3.

approved over 360 loans for HDM clients since 2013.  Babboni Decl. ¶ 13.  HDM works with

Enerbank because the loan proceeds are earmarked exclusively for payment to the contractor.  *Id.*

¶ 14.  Once a loan is approved, the borrower must execute the loan documents, and Enerbank

will release the loan proceeds to the contractor once 80% of the work on the construction project

is complete.  Babboni Decl. ¶ 15; Farr Deposition 8:4-7 (stating that no funds are disbursed until

the work is completed).

Mr. Gumbs first applied for an Enerbank loan in December 2015.  Defendant Ex. 1; *see*

*also* Hr'g Tr. 13:2-9 (June 28, 2023).  Mr. Gumbs was approved for a $30,000 loan; however,

Mr. Gumbs decided not to proceed with the renovation project at that time.  Defendant Ex. 1*;*

Hr'g Tr. 13:10-21 (June 28, 2023).  That loan expired.  Defendant Ex. 1; *see also* Hr'g Tr. 13:10-

12 (June 28, 2023)*.*  Mr. Gumbs then applied for a second Enerbank loan on March 28, 2016;

that loan was assigned a loan number ending in 1511 (the "1511 Loan").  Defendant Ex. 2; Hr'g

Tr. 14:2-17 (June 28, 2023).  Mr. Gumbs was approved for the 1511 Loan in the amount of

$30,000 on or about March 29, 2016.  Farr Deposition 14:7-9.  Mr. Gumbs informed HDM that

he was approved for the 1511 Loan.  Hr'g Tr. 16:7-8 (June 28, 2023).  Enerbank also informed

HDM of the 1511 Loan approval directly.  Hr'g Tr. 26:21-27:2 (June 27, 2023).[4]

No written contract was ever executed regarding the scope of work to be performed by

HDM.  Hr'g Tr. 110:11-13 (June 27, 2023).  Instead, HDM sent Mr. Gumbs an email in mid-

April 2016 with a description of the work to be performed along with a price.  *Id.* 111:6-9;

Plaintiff Ex. 19.  HDM's email outlining the scope of work included a price quote of $51,000.

---

[4]      The parties disagree whether Enerbank sent the documents for the 1511 Loan directly to Mr. Gumbs as
borrower or if the documents were sent to HDM as the contractor.  *Compare* Hr'g Tr. 26:6-12, 26:16-20 (June 27,
2023) (testimony of Ms. Haracz that loan documents were sent directly to the homeowner); Farr Deposition 8:8-11
(testimony of Ms. Farr that the payment authorization should go directly to the borrower), *with* Hr'g Tr. 14:18-15:10
(June 28, 2023) (testimony of Mr. Gumbs that he understood that HDM would bring paperwork to him); Hr'g Tr.
60:4-9 (June 28, 2023) (same).  For reasons that are discussed below, the credible evidence establishes that the 1511
Loan documents were sent directly to Mr. Gumbs by Enerbank.

Plaintiff Ex. 19; *see also* Babboni Decl. ¶¶ 25-32.  Mr. Gumbs was to provide cosmetic materials

for the project while HDM was to provide all general construction materials.  Babboni Decl. ¶¶

30-31; Hr'g Tr. 9:10-14 (June 28, 2023).  Mr. Gumbs told HDM that he would pay for the

renovation project with the 1511 Loan and he would be responsible for the remaining balance.

*See* Plaintiff Ex. 18 (Mr. Gumbs stating "I have 30k with ener bank [sic] that means I gotta [sic]

pay you 21k"); Plaintiff Ex. 27 (text message of October 2016 where Mr. Gumbs stated that "the

plan was to use ener bank [sic] and pay the rest on my card"); *see also* Babboni Decl. ¶ 22.  In

mid-March 2016, prior to the commencement of the renovation project, Mr. Gumbs made a

payment of $2,400 to HDM by utilizing his American Express credit card which had an account

number ending in 2009.  Plaintiff Ex. 21 (billing statement from HDM to Mr. Gumbs).[5]

        HDM commenced work on the renovation project in mid-April 2016.  Plaintiff Ex. 44;

*see also* Hr'g Tr. 17:13-18:8 (June 28, 2023).  Mr. Gumbs expanded the scope of work to be

performed by HDM twice.  Babboni Decl. ¶ 34; Plaintiff Ex. 43.  The additional work Mr.

Gumbs requested increased the total cost of the renovation by $13,414, for a total project cost of

$72,514.[6]  Babboni Decl. ¶ 36; *see also* Plaintiff Ex. 43.  Mr. Gumbs also purchased

approximately $43,000 in supplies and materials for the renovation project utilizing a Home

Depot Credit Card.  Plaintiff Ex. 20.  While the renovation work was ongoing, Mr. Gumbs made

two additional payments to HDM utilizing his American Express credit card ending in 2009: a

---

[5]        The date this statement was created is unclear.  There is a notation on the bottom right hand corner of the
document that indicates that the document may have been created on August 11, 2017, but the statement itself is not
dated.  Plaintiff Ex. 21.  In any event, the statement includes events beginning March 21, 2016 and continuing
through June 15, 2017.  *Id.*

[6]        Though Mr. Babboni testified that the total cost of the project was $72,514.00, other documents indicate a
higher total cost.  *See* Plaintiff Ex. 21 (showing a charge for "apartment renovation" of $71,314 as well as charges
for "handyman," "chimney," and "custom made corbells [sic]" which, together with the apartment renovation
charge, total $83,272.04).

payment of $4,520 on April 26, 2016 and a payment of $1,610.64 on May 23, 2016.  Plaintiff

Ex. 21.  The April 26th payment appears to be related to the charge for handyman services, *see

id.* at invoice #11323, and the May 23rd payment appears to be related to work on the chimney,

*see id.* at invoice #11554.

    While the construction work was still ongoing, the 1511 Loan expired on July 26, 2016

without Mr. Gumbs having signed the loan documents.  See Plaintiff Ex. 41; *see also* Hr'g Tr.

20:24-21:4 (June 28, 2023).  An employee of HDM—Ms. Haracz—contacted Mr. Gumbs to ask

him to execute the Enerbank loan documents for Loan 1511, with Mr. Gumbs responding that he

would do so.  *See* Hr'g Tr. 21:18-25 (June 27, 2023).  While the record is not clear on when Ms.

Haracz contacted Mr. Gumbs, it is logical to assume Ms. Haracz contacted Mr. Gumbs before

the 1511 Loan expired.  But the evidence adduced at trial indicates at least some of HDM's

communications with Mr. Gumbs about the 1511 Loan occurred after the 1511 Loan had already

expired.  *See* Defendant Ex. 3 (email from Mr. Babboni to Mr. Gumbs dated August 27, 2016

asking Mr. Gumbs to execute the Enerbank documents).

    The parties disagree on when HDM finished its work on the renovation project.  On the

one hand, Mr. Gumbs testified that HDM did not complete work on the house and that, on

August 29, 2016, Mr. Gumbs told HDM to stop all work on the renovation project.  Hr'g Tr.

88:6-14; 24:5-10; 25:2-6 (June 28, 2023).  On the other hand, Mr. Babboni testified that HDM

completed all of the work on the renovation project.  Hr'g Tr. 122:14-17 (June 27, 2023).

Weighing the credible evidence, the Court finds that the renovation project was substantially

completed by September 1, 2016, with HDM not performing any additional services after that

date.  *See* Plaintiff Ex. 43.

**B.  Post-Contract Discussions regarding Payment**

After the expiration of the 1511 Loan, Mr. Gumbs submitted a third application for a loan

from Enerbank on August 29, 2016.  Defendant Ex. 4.  That loan application was denied,

apparently because Mr. Gumbs' debt to income ratio was too high.  *Id.*; *see also* Hr'g Tr. 22:23-

23:7 (June 28, 2023).  After the third Enerbank loan application was denied, Mr. Gumbs

attempted to find alternate financing to pay the outstanding balance owed to HDM.   In

September 2016, Mr. Gumbs began the process of applying to refinance his home through Wells

Fargo.  Defendant Ex. 6 (letter dated September 13, 2016 from the loan processor stating they

were beginning the initial review of the loan application); Hr'g Tr. 26:9-27:5 (June 28, 2023)

(Mr. Gumbs testifying that in light of the denial of the third Enerbank loan, he would apply to

refinance his home).  But this application was denied in December 2016 because his residence

did not meet certain appraisal thresholds.  Defendant Ex. 8; Hr'g Tr. 29:7-16 (June 28, 2023).

After the refinancing application was denied by Wells Fargo, Mr. Gumbs learned of

another financing option through Wells Fargo that consisted of a retail credit card.  Hr'g Tr.

32:23-33:5 (June 28, 2023).  To utilize that line of credit, however, HDM would be required to

become a "preferred provider" with Wells Fargo.  Hr'g Tr. 31:7-10 (June 27, 2023).  Mr. Gumbs

reached out to HDM about becoming a preferred provider so he could use a retail credit card

from Wells Fargo to pay the outstanding balance.  Hr'g Tr. 33:9-12 (June 28, 2023).  HDM did,

in fact, become a "preferred provider" with Wells Fargo.  Hr'g Tr. 31:22-24, 32:15-16 (June 27,

2023) (testimony of Kerri Haracz that HDM became a "preferred provider"); Hr'g Tr. 127:8-10

(June 27, 2023) (Mr. Babboni testifying that HDM went through the process to become a

"preferred provider").[7]  When HDM attempted to charge $29,000 to the Wells Fargo retail card,

---

[7]      Mr. Gumbs contends that HDM did not, in fact, become a "preferred provider," which is why he was
unable to utilize the retail card to pay HDM.  *See* Hr'g Tr. 33:23-34:3 (June 28, 2023) (Mr. Gumbs testifying that

however, the charge was declined. Plaintiff Ex. 34.[8] After the denial of Mr. Gumbs' first application to refinance his home mortgage, Mr. Gumbs submitted a fourth loan application to Enerbank on May 15, 2017. Defendant Ex. 9; Hr'g Tr. 36:23-37:1 (June 28, 2023). That loan application was denied due to an excessive debt to income ratio. Defendant Ex. 9; Hr'g Tr. 37:8-12 (June 28, 2023). Mr. Gumbs again attempted to refinance his home and, to that end, submitted an application to a bank in New Jersey that Mr. Gumbs identified as Federal Savings Bank. Hr'g Tr. 37:15-19 (June 28, 2023). That application was granted in April 2017 and Mr. Gumbs refinanced his home. *Id.* at 38:1-3; *see also* Plaintiff Ex. 31 (text message of April 20, 2017 from Mr. Gumbs to Mr. Babboni stating that closing for the refinancing occurred). However, the proceeds from the refinancing were used to pay off other debts Mr. Gumbs had incurred, and no proceeds were paid to HDM. Hr'g Tr. 38:4-13 (June 28, 2023).

Between September 2016 and September 2017, while Mr. Gumbs was seeking various sources of financing, Mr. Gumbs was in contact with Mr. Babboni of HDM regarding those efforts. These communications included a number of text messages between Mr. Gumbs and Mr. Babboni. *See, e.g.,* Plaintiff Ex. 27 (text message between Mr. Gumbs and Mr. Babboni dated October 13, 2016 where Mr. Gumbs states "trust and believe in me I'm working on this and going as fast as I could go to get this resolved for both of us . . . ."); Plaintiff Ex. 28 (text message between Mr. Gumbs and Mr. Babboni dated January 9, 2017 where Mr. Gumbs states "the refi[nancing] is dead with Wells Fargo" and outlining steps he planned to take to secure

---

HDM was not approved because of its issues with the IRS). The weight of the credible evidence, including the testimony of Ms. Haracz—a third party witness who is no longer an employee of HDM—suggests that HDM did become a Wells Fargo "preferred provider."

[8]    The credit card transaction was apparently declined due to "invalid card info[rmation]." Plaintiff Ex. 34; *see* Hr'g Tr. 34:15-18 (June 27, 2023). The record does not contain any indication of why the card information was invalid or whether any attempts were made to obtain the correct information to allow a charge to that account. However, the Court finds that failure to utilize the Wells Fargo retail card was for reasons other than HDM's status as a "preferred provider."

other forms of financing); Plaintiff Ex. 29 (text message between Mr. Gumbs and Mr. Babboni

dated January 12, 2017 discussing use of the Wells Fargo retail card and Mr. Gumbs stating that

he found a bank that may be able to provide a refinancing); Plaintiff Ex. 30 (text messages

between Mr. Gumbs and Mr. Babboni dated April 7, 2017 and April 17, 2017 stating that Mr.

Gumbs received a closing date for the refinancing with Federal Savings Bank); Plaintiff Ex. 31

(text message between Mr. Gumbs and Mr. Babboni dated April 20, 2017 stating that Mr.

Gumbs "closed the deal" and was waiting for the bank's lawyer to send out the money);  Plaintiff

Ex. 32 (text message between Mr. Gumbs and Mr. Babboni dated May 18, 2017 where Mr.

Gumbs states that HDM will have the $30,000 from the Wells Fargo retail credit card

tomorrow).

During this same time, Mr. Gumbs made several payments—albeit modest ones—to

HDM after the completion of HDM's work on Mr. Gumbs' home.  On January 3, 2017, Mr.

Gumbs utilized a Visa credit card ending in 1468 to make a payment of $3,427.41.  Plaintiff

Ex. 21.  This payment appears to be for "custom made corbels [sic]."  *Id.*  Two additional

payments were made on June 15, 2017: one payment for $5,000 was made using a Visa credit

card ending in 1468 and a second payment of $4,500 was made using a Visa credit card ending

in 2129.  *Id.*

### C.  Mr. Gumbs' Travel

At trial, HDM introduced evidence as to Mr. Gumbs spending money on two trips prior

to filing bankruptcy.  Mr. Gumbs took one trip to Florida and one trip to Las Vegas.  Hr'g Tr.

44:1-2 (June 28, 2023).  Mr. Gumbs explained that he took these trips because his wife had won

them in a radio contest.  *Id.* at 43:10-16.[9]  Mr. Gumbs traveled to Florida with his family; he paid

---

[9]      HDM challenged Mr. Gumbs' account of his travel.  At trial, HDM provided the Court with documents
produced in response to a subpoena issued to iHeartMedia, the parent company to the radio station identified by Mr.

for flights, car rental, entertainment, and dining out of pocket.  *Id.* at 44:4-8; 44:21-45:3.  Mr.

Gumbs' trip to Las Vegas was with his wife; he also paid for flights, car rental, and dining for

that trip out of pocket.  *Id.* at 44:4-20.

### D.  The Bankruptcy and Adversary Proceeding

In mid-2017, Mr. Gumbs began to contemplate filing bankruptcy when he became unable

to meet his financial obligations.  Hr'g Tr. 40:21-42:12 (June 28, 2023); *see also* Plaintiff Ex. 13.

Mr. Gumbs informed HDM that he had begun the bankruptcy process in July 2017.  Plaintiff Ex.

13.  Mr. Gumbs actually filed a petition under Chapter 7 of the Bankruptcy Code in mid-

December 2017.  *See* Petition [ECF No. 1, Case No. 17-23947].  In March 2018, HDM initiated

this adversary proceeding.  *See* ECF No. 1.

## CONCLUSIONS OF LAW

### A.  Applicable Standard

It is well settled that "[c]ourts construe exceptions to discharge narrowly and in favor of

the debtor."  *Wang v. Guo (In re Guo)*, 548 B.R. 396, 401 (Bankr. E.D.N.Y. 2016) (citing

*Cazenovia Coll. v. Renshaw (In re Renshaw)*, 222 F.3d 82, 86 (2d Cir.2000)); *see also Denton v.

Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007) (citing *Renshaw*, 222 F.3d at 86)

("[E]xceptions to discharge are to be narrowly construed and genuine doubts should be resolved

in favor of the debtor.").  This is because

> [t]he central purpose of the Code is to provide a procedure by which certain insolvent
> debtors can reorder their affairs, make peace with their creditors, and enjoy a new
> opportunity in life and a clear field for future effort, unhampered by the pressure and

---

Gumbs as the source of the purported prize.  *See* Plaintiff Ex. 16.  That subpoena response indicated that no records
concerning either Mr. Gumbs or his wife could be found.  The credible weight of the evidence does not support
finding that Mr. Gumbs' wife did, in fact, win these trips.  For the reasons discussed in greater detail below,
however, the Court declines to afford much significance to Mr. Gumbs' travel and thus concludes that this
discrepancy is not a material fact.

discouragement of preexisting debt.  The discharge provided by the Code is meant to effectuate this 'fresh start' policy of bankruptcy relief.

*Signature Bank v. Banayan (In re Banayan)*, 468 B.R. 542, 572 (Bankr. N.D.N.Y. 2012) (internal citations and quotations omitted).  Nevertheless, the "fresh start" is only available to the "honest but unfortunate debtor."  *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991); *see also Katz v. Deedon (In re Deedon)*, 419 B.R. 1, 5 (Bankr. D. Conn. 2009) ("[T]he relief of a bankruptcy discharge is not an absolute right, but rather, a privilege accorded honest debtors who provide full and honest disclosure to creditors and otherwise satisfy bankruptcy statutory obligations.").

The burden of proof to establish nondischargeability lies with the creditor, who must prove "by a preponderance of the evidence, that the particular debt falls within one of the exceptions to discharge enumerated in § 523(a)."  *Reddy v. Melnik (In re Melnik)*, 592 B.R. 9, 21 (Bankr. N.D.N.Y. 2018*), aff'd sub nom. Reddy v. Melnik*, 2019 WL 2766592 (N.D.N.Y. July 2, 2019), *aff'd sub nom. In re Melnik*, 2021 WL 5987010 (2d Cir. Dec. 17, 2021) (citing *Grogan*, 498 U.S. at 286–91).  In weighing the evidence, "a bankruptcy court must construe the evidence strictly against the creditor and liberally in favor of the debtor." *Id.* (citing *Banayan,* 468 B.R. at 573 n. 285).

HDM contends that Mr. Gumbs' debt is nondischargable under Section 523(a)(2)(A) of the Bankruptcy Code, which provides that a debt should not be discharged to the extent it is "obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).  While "[t]he terms 'false pretenses,' 'false representation,' and 'actual fraud' 'embody somewhat differing concepts' within the context of § 523(a)(2)(A)," *Suparo Int'l Inc. v. Kedia (In re Kedia)*, 607 B.R. 101, 109 (Bankr. E.D.N.Y. 2019) (quoting *In re Dobrayel*, 287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002)), each involves some action done or some statement made with the

intent to deceive.  For example, "the term 'false pretenses' means 'conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property.'"  *Giglio v. Nisivoccia (In re Nisivoccia)*, 502 B.R. 139, 155–56 (Bankr. E.D.N.Y. 2013) (citing *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 261 (Bankr. S.D.N.Y.2000)).   A false representation requires showing that the debtor: 1) made a false representation; 2) at the time the representation was made, the debtor knew it was false; 3) the debtor made the representation with intent to deceive the creditor; 4) the creditor justifiably relied on the representation; and 5) the creditor sustained loss or damage as a proximate consequence of the false representation.  *See Lupe Development Partners, LLC v. Deutsch (In re Deutsch*), 575 B.R. 50, 58–59 (Bankr. S.D.N.Y. 2017).  "The term 'actual fraud' encompasses 'any deceit, artifice, trick, or design involving direct or indirect operation of the mind, used to circumvent or cheat another.'"  *Melnik,* 592 B.R. at 22 (quoting *Banayan*, 468 B.R. at 577 n.306).   In other words, "anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'"  *Husky Int'l Electronics, Inc. v. Ritz*, 578 U.S. 355, 360 (2016); *see also Citbank (South Dakota), N.A., v. Senty (In re Senty)*, 42 B.R. 456, 459 (Bankr. S.D.N.Y. 1984) ("A case in fraud at common law requires proof of a material misrepresentation, knowingly made with intent to deceive, which statement is reasonably relied on by the plaintiff to its detriment.") (internal citation omitted).   "Intent to deceive may be inferred when the totality of the circumstances presents a picture of deceptive conduct by the debtor, which indicates that he did intend to deceive and cheat the lender."  *In re Shaheen*, 111 B.R. 48, 53 (S.D.N.Y. 1990) (citing *In re Schlickmann*, 6 B.R. 281, 282 Bankr. D. Mass.1980)).  A creditor's reliance on the false fraudulent misrepresentation must be justifiable.  *Field v. Mans*, 516 U.S. 59, 61 (1995).

**B. Standing**

As a threshold matter, Mr. Gumbs argues that HDM does not have standing to object to his discharge here because the debt is unenforceable as HDM did not demonstrate it was a licensed home improvement contractor and there was no written contract for these services. *See* Defendant's Brief ¶¶ 59-62. As standing is a threshold issue, *see Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir. 1991), the Court will address this issue even though it was raised belatedly for the first time just before trial. *See* Letter to the Court dated May 1, 2023 [ECF No. 120].

The Court rejects Mr. Gumbs' contention that HDM has no standing. The credible weight of the evidence shows that, at the time HDM provided services to Mr. Gumbs, it was a licensed contractor. *See* Hr'g Tr. 107:17-21, 108:6-11 (June 27, 2023). If a home improvement contractor is licensed, the contractor may recover under a theory of quantum meruit even in the absence of a written contract. *See* Defendant's Brief ¶ 62 (conceding this point); *Jaeger v. Bellavia*, 172 A.D.3d 1501, 1501, (App. Div. 3d. Dep't 2019) ("Although a contractor cannot enforce a contract that fails to comply with General Business Law § 771, a contractor may seek to recover based on the equitable theory of quantum meruit."); *Johnson v. Robertson*, 131 A.D.3d 670, 672 (App. Div. 2nd Dep't 2015); *Frank v. Feiss*, 266 A.D.2d 825, 826 (App. Div. 4th Dep't 1999). Accordingly, HDM has demonstrated "a pecuniary interest in the case's outcome" sufficient to confer standing to pursue this action. *In re Chaitan*, 517 B.R. 419, 426 (Bankr. E.D.N.Y. 2014) (citing *In re Slack*, 164 B.R. 19, 22 (Bankr. N.D.N.Y. 1994)).

In fact, Mr. Gumbs' bankruptcy petition lists HDM as an unsecured creditor with the amount of the debt as unknown, and the type of debt as an "action for money judgment." *See* ECF No. 1, Case No. 17-23947. Significantly, the debt is not listed as contingent, disputed, or

13

unliquidated.  *Id.*  "Bankruptcy schedules, executed under penalty of perjury, when offered against a debtor are eligible for treatment as judicial admissions."  *In re Arcade Pub., Inc.*, 455 B.R. 373, 382 n.11 (Bankr. S.D.N.Y. 2011) (citing *In re Jorczak*, 314 B.R. 474, 482–83 (Bankr. D. Conn.2004)).  Accordingly, Mr. Gumbs' designation of HDM as a creditor is binding and also confers standing on HMD to object to the discharge of this debt.

### C.  Whether Mr. Gumbs' Conduct Constituted a False Representation, False Pretense or Actual Fraud

With standing resolved, the Court turns to the main issue here: whether there are any statements or conduct that would constitute a false representation, false pretense, or actual fraud under Section 523(a)(2)(A).  HDM contends there are a number of misrepresentations, all of which relate in one way or another to Mr. Gumbs' promise to pay HDM for the renovation work. *See* Plaintiff's Brief.  Broadly speaking, the representations identified by HDM as fraudulent relate to Mr. Gumbs' promises to pay and his statements about his efforts to obtain funds to pay HDM.  *See, e.g.,* Plaintiff's Brief at ¶¶ 38-40 (alleging that Mr. Gumbs made a false representation as to his intent to execute the Enerbank loan documents); *id.* at ¶¶ 129-33 (alleging that Mr. Gumbs' third and fourth applications for loans from Enerbank were a "charade"); *id.* at ¶¶ 134-149 (alleging that Mr. Gumbs fraudulently induced HDM to become a "preferred provider with Wells Fargo"); *id.* at ¶ 142 (alleging that Mr. Gumbs made a false representation when he stated he had a loan commitment from Wells Fargo); *id.* at ¶¶ 104-114, 116-121, 151, 167, 172-73 (alleging that Mr. Gumbs' statement that he did everything he could to pay HDM is belied by the fact that Mr. Gumbs failed to use an available line of credit to pay HDM, failed to accept a payment plan offered by HDM, failed to use proceeds from the refinancing of his home to pay HDM, and failed to pay for the supplies purchased for the home renovation project by charging the supplies to a credit card and not paying that credit card).

14

The Court finds, however, that none of the supposed false pretenses or false representations can form the basis for HDM's nondischargeability action—with the exception of Mr. Gumbs' alleged false representations regarding the execution of the 1511 Loan documents— because they all occurred after HDM provided services to Mr. Gumbs. Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, *to the extent obtained by* false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A) (emphasis added). Thus, the plain terms of the statute require that the false pretenses be used to obtain the property or services. In other words, "Section 523(a)(2)(A) explicitly limits 'nondischargeable debts to the loss suffered as the proximate result of the misrepresentation.'" *Labbadia v. Martin (In re Martin)*, 2020 WL 2787681, at *8 (Bankr. D. Conn. May 28, 2020)*, aff'd*, 2021 WL 1670292 (D. Conn. Apr. 27, 2021) (quoting *Fellows, Read and Assocs., Inc. v. Rieder*, 116 F.3d 465 (2d Cir. 1997) (summary order). Stated another way, "[t]here is an 'inherent sequential order of the elements of fraud . . . the misrepresentation must come first, the reliance second and the damage last.'" *Id.* (quoting *In re Rieder*, 178 B.R. 373, 380 (Bankr. S.D.N.Y. 1995), *aff'd, sub nom.*, 194 B.R. 734 (S.D.N.Y. 1996), *aff'd, Fellows, Read and Associates, Inc. v. Rieder*, 116 F.3d 465 (2d Cir. 1997) (summary order).

HDM does not dispute, and in fact expressly maintains, that all services by HDM to Mr. Gumbs were complete by September 1, 2023. *See* Plaintiff's Brief ¶ 332 ("Project II was completed by September 1, 2016."); Plaintiff Ex. 43. Thus, any fraudulent representation, pretense, or fraud used to obtain HDM's services must have occurred prior to September 2016. But the vast majority of the alleged misrepresentations on which HDM relies occurred after HDM finished providing services to Mr. Gumbs. For example, Mr. Gumbs' first efforts to refinance his house and his representation regarding such a loan commitment all took place in

15

fall 2016, after HDM's services were completed.  Defendant Exs. 7, 8.  This is true for many of

the other statements and representations of Mr. Gumbs relied on by HDM.  *See, e.g.,* Plaintiff

Ex. 12 at 6:6-7 (Mr. Gumbs' alleged misrepresentation that "everything he did was for the

house," which was made during Mr. Gumbs' testimony at the 341 meeting in his bankruptcy

case which occurred on January 26, 2018, a year and a half after HMD ceased providing services

to Mr. Gumbs).

The only alleged misrepresentations relied on by HDM that occurred before HDM's

services were completed are the alleged representations that Mr. Gumbs would sign the 1511

Loan.  More specifically, HDM asserts that Mr. Gumbs falsely represented that he would execute

the 1511 Loan documents—despite never intending to do so—to induce HDM to provide home

renovation services.  *See*, *e.g.,* Plaintiff's Brief ¶¶ 57-66; Babboni Decl. ¶ 42-46.  HDM argues

that "Mr. Gumbs never intended to pay HDM through the use of the EnerBank loan because he

intentionally failed to execute the EnerBank release document after representing that he would

execute the EnerBank loan release document."  Babboni Decl. ¶ 48.

Several facts bolster HDM's position.  Mr. Gumbs does not dispute that he was required

to sign the loan documents before the funds from the loan could be released to HDM.  Hr'g Tr.

14:17-16:3 (June 28, 2023).  Moreover, the credible weight of the evidence establishes that Mr.

Gumbs received these documents directly from Enerbank.  *See* Hr'g Tr. 26:9-20 (June 27, 2023)

(Ms. Haracz testified that Enerbank sends the loan documents directly to the homeowner); Farr

Deposition at 8:8-13 (Enerbank employee testifying that payment authorizations are sent directly

to the borrower).[10]  Further, Ms. Haracz credibly testified that when she spoke to Mr. Gumbs

---

[10]    Mr. Gumbs makes much of the fact that Ms. Farr, the Enerbank employee, could not state with certainty
whether the documents related to the 1511 Loan were sent directly to Mr. Gumbs.  *See* Defendant's Brief ¶ 54
(citing the Farr Deposition at 12-16).  But the Court credits Ms. Farr's testimony as a disinterested witness that the

about executing the loan paperwork, Mr. Gumbs never stated that he had not received the

paperwork, but instead said he had to review it and would sign it. Hr'g Tr. 21:21-22:2 (July 27,

2023). The Court also credits the testimony of Ms. Haracz that Mr. Gumbs stated that he would

sign the loan documents related to the 1511 Loan. Hr'g Tr. 21:21-25 (June 27, 2023). The

credible weight of the evidence supports a finding that HDM reached out to Mr. Gumbs several

times to inquire about execution of the loan documents and Mr. Gumbs repeated his promise that

he would execute the loan documents. *See* Hr'g Tr. 21:18-25 (June 27, 2023) (testimony of Ms.

Haracz that she called Mr. Gumbs to request that he sign the loan documents). Given that HDM

was notified when Mr. Gumbs was approved for the 1511 Loan, Hr'g Tr. 26:21-27:2 (June 27,

2023), and the fact that HDM has worked with hundreds of Enerbank loans, it is reasonable to

infer that Ms. Haracz called Mr. Gumbs about executing the loan documents prior to the

expiration date of the loan. Mr. Babboni also testified that he contacted Mr. Gumbs three days

before the 1511 Loan expired. *See* Hr'g Tr. 116:5-11, 117:24-118:3 (June 27, 2023); *see also*

Defendant Ex. 3 (email from Mr. Babboni to Mr. Gumbs stating that HDM needed Mr. Gumbs to

execute the loan documents). While the date of the phone call is not in the record, the Court also

draws a reasonable inference that the phone call was made prior to the expiration of the 1511

Loan, particularly given Mr. Babboni's specific testimony that the call was made before the loan

expired.[11]

---

general business practice of Enerbank was to send loan documents directly to the borrower and there was no reason
that the procedure would have changed with regard to Ms. Gumbs' loan. *See* Farr Deposition at 8:10-14, 18:20-23.

[11]    Mr. Gumbs testified that the first time he was notified that he needed to execute the Enerbank loan
documents was on August 27, 2016, when he received an email from Mr. Babboni asking him to execute the
Enerbank loan documents. Hr'g Tr. 19:9-20:3 (June 28, 2023). But the Court does not find this testimony credible,
particularly in light of Ms. Haracz's credible testimony that she called Mr. Gumbs about the loan. Hr'g Tr. 21:18-20
(June 27, 2023).

The Court also finds that HDM justifiably relied on these representations that Mr. Gumbs would execute the loan documents. In the decade that HDM has been working with Enerbank, Mr. Gumbs is the only customer who did not execute the Enerbank loan documents. Babboni Decl. ¶ 16. Further, Mr. Gumbs had previously paid in full for projects completed by HDM. *Id.* ¶ 8. Nothing in the record supports a finding that HDM's reliance on Mr. Gumbs' representations was unreasonable.

With these facts as a given, the question becomes whether Mr. Gumbs made these statements about the 1511 Loan with an intent to not execute the loan documents and leave HDM out in the cold. *See In re Melnik*, 592 B.R. at 25 ("The issue of intent requires actual or positive intent. For purposes of § 523(a)(2)(A), scienter requires a showing that, at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation.") (internal citations omitted). "If the objection to dischargeability is based upon an unperformed promise, the proponent must show that the debtor did not intend to perform or had no reasonable basis to believe that she could perform when she made the promise." *Aldus Green Co. v. Mitchell (In re Mitchell)*, 227 B.R. 45, 51 (Bankr. S.D.N.Y. 1998) (citing *Ellis v. Shear (In re Shear)*, 123 B.R. 247, 253 (Bankr. N.D. Ohio 1991)).

Applying this standard to the entire record, the Court finds that the credible evidence does not establish the requisite intent. While Mr. Gumbs' failure to execute the loan documents as soon as he received them may have been careless or even negligent, "'mere negligence' and 'poor business judgment' are insufficient to satisfy '[t]he discharge exception under Section 523.'" *Jaroslawicz v. Steinberg (In re Steinberg)*, 2017 WL 1184314, at *4 (S.D.N.Y. Mar. 29, 2017) (quoting *Sarasota CCM, Inc. v. Kuncman*, 466 B.R. 590, 594 (E.D.N.Y. 2012)). Several facts show his lack of intent. As soon as Mr. Gumbs learned that the 1511 Loan expired, he

swiftly applied for a new Enerbank loan. *See* Defendant Ex. 4 (showing that Mr. Gumbs applied

for a third Enerbank loan on August 29, 2016); *see also* Hr'g Tr. 21:21-22:7 (June 28, 2023).

This application came at a time when HDM had almost completed the work on Mr. Gumbs'

residence. *See* Defendant Ex. 3 (email from Mr. Babboni to Mr. Gumbs dated August 27, 2016

stating "I am very excited to have the work almost complete"); Plaintiff Ex. 43 (email from Mr.

Babboni to Mr. Gumbs indicating that the work was completed). Had Mr. Gumbs never

intended to pay HDM, it would seem highly unlikely that he would immediately take steps to

attempt to obtain a new loan, particularly with the renovation almost finished. It also seems

unlikely that, as discussed below, Mr. Gumbs would continue to seek other financing, including

attempting to refinance his home and subsequent applications to Enerbank, if he lacked the intent

to pay HDM.[12] Further, HDM's own records demonstrate that Mr. Gumbs did, in fact, make

payments to HDM on a variety of dates—both during and after construction—using a number of

different credit cards. *See* Plaintiff Ex. 21 (HDM invoices to Mr. Gumbs). These invoices show

that Mr. Gumbs made total payments of $21,458.04 utilizing four different credit cards. *Id.*[13]

While these payments are not for the full amount owed, the fact that multiple payments were

made—and the majority of the funds were paid after work was completed—belie the assertion

that Mr. Gumbs had no intent to pay when he promised to complete the 1511 Loan paperwork.

*See Chase*, 372 B.R. at 137–38 (an intention to pay can be shown by making payments towards

the obligation). Indeed, "misconceived optimism is not uncommon to the financially distressed."

---

[12]     HDM correctly points out that Mr. Gumbs eventually was successful in refinancing his home but never used the proceeds to pay HDM. But this event took place in April 2017, seven months after work on the renovation project was completed. *See* Plaintiff Ex. 31.

[13]     The payments reflected in HDM's invoices are as follows: 1) $2,400 paid using an American Express card ending in 2009 on March 21, 2016; 2) $4,520 paid using an American Express card ending in 2009 on April 26, 2016; 3) $1,610.63 paid using an American Express card ending in 2009 on May 23, 2016; 4) $3,427.41 paid using a Visa credit card ending in 0294 on January 3, 2017; 5) $5,000 paid using a Visa credit card ending in 1468 on June 15, 2017; and 6) $4,500 paid using a Visa credit card ending in 2129 on June 15, 2017. Plaintiff Ex. 21.

*Matter of Buford*, 25 B.R. 477, 482 (Bankr. S.D.N.Y. 1982).  Mr. Gumbs' action speak more to a

debtor who continued to attempt to rectify a sinking financial ship than to a debtor who

engineered a plot to deceive a creditor for an extended period of time.

In reaching this conclusion, the Court notes that "[f]raud is not shown by the mere failure

of performance, and "[a] string of broken promises and optimistic predictions . . . will not

support a fraud claim."  *In re Fletcher*, 2013 WL 1386265, at *3 (Bankr. S.D.N.Y. Apr. 4, 2013)

(citing *In re Alicea*, 230 B.R. at 499).  HDM's argument that a failure to make good on a promise

to pay constitutes fraudulent inducement would render nearly every debt nondischargeable.  *See*

*In re Barrios*, 2007 WL 2406881, at *3 (Bankr. S.D.N.Y. Aug. 20, 2007) ("It is insufficient

under section 523(a)(2)(A) 'simply to show that [a] debtor left unfulfilled a prior oral

representation or promise.  Were this showing sufficient, virtually every oral obligation would

give rise to a non-dischargeable debt under § 523(a)(2)(A).'") (quoting *Jarina v. Balzano (In re*

*Balzano),* 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991)).  The full evidentiary record demonstrates

such a "string of broken promises" rather than an intentional misrepresentation designed to

deceive HDM.

### D.  HDM's Other Arguments

HDM complains that Mr. Gumbs failed to utilize available lines of credit to pay HDM.

*See, e.g.,* Plaintiff's Brief ¶¶ 104-115 (stating that Mr. Gumbs had a $41,000 credit line with

Bank of America that he failed to utilize to pay HDM); *id.* ¶ 442 ("Mr. Gumbs failed to pay the

balance of the bill that he was responsible for paying from his personal resources, his credit

cards.").  To be sure, Mr. Gumbs did state that he would pay $21,000 towards the cost of the

project and utilize the $30,000 Enerbank loan to finance the remainder.  *See* Plaintiff Ex. 18 (text

message from Mr. Gumbs to Mr. Babboni stating "I have 30k with ener bank [sic] that means I

20

gotta [sic] pay you 21k"). But standing alone, this is not a basis for nondischargeability. "By itself, the defendant's promise to pay the plaintiff and the later failure to do so is insufficient for purposes of § 523(a)(2)(A)." *In re Martin*, 2020 WL 2787681, at *11 (citing *In re Christodoulakis*, 2019 WL 360064, at *8 (Bankr. E.D.N.Y. Jan. 25, 2019)).

HDM also argues that Mr. Gumbs "created a false impression that he would use the proceeds from the refinancing [of his home] to pay HDM." Plaintiff's Brief ¶ 349; *see also id.* ¶ 506 (calling Mr. Gumbs' representation that he would pay HDM from the proceeds of the refinancing a "fraudulent sham"). However, neither Mr. Gumbs' first failed attempt to refinance his home nor his second successful attempt constitute the type of conduct that would render the debt to HDM nondischargeable. The representation about both of those efforts took place after the renovation work was completed. HDM also does not dispute that Mr. Gumbs' first attempt to extract equity from his home through a refinancing was unsuccessful due to factors outside Mr. Gumbs' control. *See* Defendant Ex. 8 (emails between Mr. Gumbs and a Wells Fargo loan officer stating that the appraisal of Mr. Gumbs' home came in lower than anticipated). When Mr. Gumbs eventually successfully refinanced his home in 2017, $50,000 in proceeds was generated from the refinancing. Hr'g Tr. 94:3-19 (June 28, 2023). But Mr. Gumbs testified that he did not receive the funds as the mortgagee distributed the funds directly to other creditors and Mr. Gumbs was not able to direct the payments. *Id.* at 94:16-21. HDM did not provide evidence to show otherwise. The Court finds *In re Chase*, 372 B.R. 133, to be highly instructive as to the second refinancing. In that case, the debtor had entered into a contract with the creditor wherein the creditor agreed to provide legal services to the debtor in exchange for payment. *Id.* at 135. The debtor made numerous representations to the creditor that the debtor would pay for the services, and at one point, promised that the creditor would be paid out of the proceeds of the

sale of the debtor's home.  *Id.* at 135-36.  However, the home was not sold despite entry of a

stipulation entered in a separate legal proceeding stating that the home would be sold.  *Id.* at 138.

The *Chase* court ultimately held that the debtor did not make false statements "with the intent to

deceive and induce reliance" because there was no evidence to suggest that the debtor did not

intent to pay at the time the representations were made, particularly in light of the fact that the

debtor had made some payments.  *Id.* at 138.  "The fact that the Debtor subsequently decided he

would not or could not pay for these services is of no consequence."  *Id.* at 139 (citing *In re

Alicea*, 230 B.R. 492, 501 (Bankr. S.D.N.Y. 1999)).

       HDM also accuses Mr. Gumbs of engaging in "profligate spending" on non-essential

items instead of paying HDM.  Plaintiff's Brief ¶ 133; *see also id.*¶¶ 144-45.  Specifically, HDM

asserts that, rather than pay HDM, Mr. Gumbs utilized his credit cards to take a number of trips

to a variety of locations.  *Id.* ¶ 212.  At trial, Mr. Gumbs testified that his wife won two of those

trips, to Florida and Las Vegas, in a radio contest.  Hr'g Tr. 43:10-16 (June 28, 2023).  While the

truth of Mr. Gumbs' account of this travel is in doubt, *see* Plaintiff Ex. 16, all of the travel cited

occurred more than a year after the services were already rendered by HDM.  No requirement

that a debtor use otherwise available funds or sources of credit to make a payment exists.  When

examining whether a debt can be discharged based on an unperformed promise under Section

523(a)(2)(A), the only relevant inquiry is whether a creditor can make a showing that the "debtor

did not intend to perform or had no reasonable basis to believe that []he could perform *when []he

made the promise*."  *In re Mitchell*, 227 B.R. at 51 (citing *Ellis v. Shear (In re Shear)*, 123 B.R.

247, 253 (Bankr.N.D.Ohio1991) (emphasis added).

       The final argument of HDM that must be addressed is forbearance.  HDM argues that Mr.

Gumbs fraudulently induced HDM into forbearing on collection, which it contends constitutes an

extension of credit. *See generally* Plaintiff's Brief ¶¶ 492-517. HDM asserts that it was justified in relying on Mr. Gumbs promise of payment in deciding to forbear in taking any legal action to collect the debt owed. *Id.* ¶¶ 181-83. Courts across the country have reached different conclusions regarding whether a creditor's forbearance of collection activities constitutes "an extension, renewal or financing of credit" required for a finding of nondischargeability under Section 523(a)(2). *Compare Drinker, Biddle & Reath v. Bacher (In re Bacher)*, 47 B.R. 825, 829 (Bankr. E.D.PA.1985) ("Forbearing collection efforts does not constitute an extension of credit within the meaning of [Section] 523(a)(2)(A)."); *Howard & Sons, Inc. v. Schmidt (In re Schmidt)*, 70 B.R. 634 (Bankr. N.D. Ind. 1986) (find that, to support a claim of nondischargeability, the consideration received by the debtor for the debt must be actual money, tangible property or services, or the release of an underlying non-dischargeable claim); *see also Cmty. First Bank v. Rigg (In re Rigg)*, 310 B.R. 725, 732 (Bankr. W.D. Ark. 2004), *with Ojeda v. Goldberg*, 599 F.3d 712, 718 (7th Cir. 2010) ("[A] fraudulently induced forbearance does constitute an extension or renewal."); *John Deere Co. v. Gerlach (In re Gerlach)*, 897 F.2d 1048, 1050 (10th Cir. 1990) (quoting *Takeuchi Mfg. (U.S.), Ltd. v. Fields (In re Fields)*, 44 B.R. 322, 329 (Bankr. S.D. Fla. 1984) ("The Bankruptcy Code, therefore, protects a creditor 'who is deceived into forbearing from collection.'"); *Nat'l City Bank v. Plechaty (In re Plechaty)*, 213 B.R. 119 (6th Cir. BAP 1991).

But closer to home, the Second Circuit has rejected the assertion that forbearance constitutes an extension of credit within the meaning of Section 523(a)(2)(A). *See In re Kressner*, 206 B.R. 303, 310 (Bankr. S.D.N.Y. 1997), *subsequently aff'd*, 152 F.3d 919 (2d Cir. 1998) (holding that "whatever [the debtor] may have or did in fact say to [the creditor] has nothing to do with the creation of the debt herein . . . there was no contemporaneous extension or

23

renewal of credit extended by the [the creditor] nor was there any contemporaneous transfer of property, services or money by the [creditor] to the Debtor at the time these allegedly fraudulent acts were committed.)"; s*ee also Wegmans Food Markets, Inc. v. MacArthur*, 2001 WL 34545897, at *3 (W.D.N.Y. July 13, 2001) (adopting the reasoning of *Kressner* that Section 523(a)(2)(A) is inapplicable where the debtor has not obtained money, property, or services).

In any event, the cases on which HDM relies are factually distinguishable. For example, in *Ojeda*, the debtors obtained a short term, high risk loan, offering stock as collateral. *Ojeda,* 599 F.3d 7 at 715. The Debtors obtained an extension of the maturity date multiple times; after the extension of the maturity date, a stock split occurred, rendering the collateral stock worthless, and the debtors sold other assets without informing the lender. *Id.* at 715-16. In *Plechaty*, the debtor obtained a forbearance on corporate debt by offering a personal guaranty premised on a false financial statement. *Plechaty,* 213 B.R. at 125. And in *Gerlach,* the debtor submitted sham purchase agreements to the creditor in order to obtain provisional credit. *Gerlach*, 897 F.2d at 1049. By contrast, the Court does not find that Mr. Gumbs' conduct shows an attempt to fraudulently induce a forbearance given the full evidentiary record for the same reasons stated above, including his payments to HDM after the work was complete. *See* Plaintiff Ex. 21 (showing one payment on January 3, 2017 and two payments on June 15, 2017 totaling $12,927.41). Paying for services already rendered is inconsistent with an intent to fraudulently induce forbearance of collection efforts.

In reaching its decision today, the Court does not seek to minimize the harm caused to HDM by the nonpayment of the debt, or HDM's understandable frustration at exercising patience only to be rewarded with a string of broken promises about payment. While the Court sympathizes with HDM and Mr. Babboni, the Court cannot find a debt to be nondischargeable

24

simply because of broken promises.  "[N]ot every wrongful or even criminal act by a debtor

which results in indebtedness is nondischargeable, only those specifically excepted from

discharge by Congress in Section 523."  *MacArthur*, 2001 WL 34545897, at \*5.  Providing a

discharge even when it harms a small business such as HDM is consistent with "Congress's

policy decision to afford reorganizing debtors a fresh start at the possible expense of creditor

interests."  *Browning v. MCI, Inc. (In re WorldCom, Inc.)*, 546 F.3d 211, 221 (2d Cir. 2008).[14]

## <u>CONCLUSION</u>

For all of the reasons discussed above, the Court finds that Mr. Gumbs is entitled to

judgment on all claims asserted against him by HDM.  Mr. Gumbs is directed to settle an order

on five days' notice consistent with this memorandum of decision.  The proposed order must be

submitted by filing a notice of the proposed order on the docket, with a copy of the proposed

order attached as an exhibit to the notice.


Dated: White Plains, New York
       October 10, 2024

                                    */s/ Sean H. Lane*
                                    UNITED STATES BANKRUPTCY JUDGE

---

[14]    There is one evidentiary issue remaining from the trial.  At trial, HDM offered Plaintiff's proposed exhibit 23 into evidence.  *See* Hr'g  Tr. 81:10-18 (June 28, 2023).  The exhibit consists of a statement for a bank account for the period of June 1, 2022 to June 30, 2022 in the name of Mr. Gumbs' minor child and which showed a deposit of $45,050.08 to the account.  Hr'g Tr. 82:1-83:2 (June 28, 2023).  Mr. Gumbs testified that those funds were proceeds from the refinancing of his home in 2022, presumably a second refinancing after the successful one in 2017.  Hr'g Tr. 82:15-19 (June 28, 2023).  Mr. Gumbs's counsel objected to the admission based on its lack of relevance to the proceeding.  Hr'g  Tr. 81:19-20 (June 28, 2023).  The Court took the question of the admissibility of exhibit 23 under advisement.  *Id.* at 84:21-85:1.

    Fed. R. Civ. P. 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  HDM argues that the exhibit in question is relevant because it demonstrates Mr. Gumbs' fraudulent intent.  Hr'g Tr. 83:9-18 (June 28, 2023).  To be relevant here, the evidence would need to relate to Mr. Gumbs' intent at or before the time HDM completed its services to Mr. Gumbs.  The exhibit in question reflects actions taken in 2022, nearly six years after HDM provided services to Mr. Gumbs and five years after Mr. Gumbs filed for bankruptcy.  So even assuming its admissibility, this exhibit does not change the Court's decision today.